# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

EMSI ACQUISITION, INC. (as assignee of : 
Mark S. Davis and Robert P. Brook), :
 :
    Plaintiff/Counterclaim-Defendant, :
 :
v. : C.A. No. 16-1046-LPS
 :
RSUI INDEMNITY COMPANY, :
 :
    Defendant/Counterclaim Plaintiff/ :
    Third-Party Plaintiff, :
 :
v. :
 :
EMSI HOLDING COMPANY, :
 :
    Third-Party Defendant. :

Philip Trainer, Jr., ASHBY & GEDDES, Wilmington, DE
Lauren Neal Bennett, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE
Stephen C. Hackney, Timothy W. Knapp, KIRKLAND & ELLIS, Chicago, IL

    Attorneys for Plaintiff/Counterclaim-Defendant, EMSI Acquisition, Inc.

Michael F. Duggan, Emily Kara Silverstein, MARKS O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C., Wilmington, DE
Kevin A. Lahm, WALKER WILCOX MATOUSEK LLP, Chicago, IL

    Attorneys for Defendant/Counterclaim Plaintiff/Third-Party Plaintiff, RSUI Indemnity Company

Lauren Neal Bennett, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE
Stephen C. Hackney, Timothy W. Knapp, KIRKLAND & ELLIS, Chicago, IL

    Attorneys for Third-Party Defendant, EMSI Holding Company

## MEMORANDUM OPINION

January 31, 2018
Wilmington, Delaware

*[signature]*

**STARK, U.S. District Judge:**

Pending before the Court are cross-motions for partial judgment on the pleadings, filed pursuant to Federal Rule of Civil Procedure 12(c). The first motion was filed by Plaintiff/Counterclaim-Defendant EMSI Acquisition, Inc. ("EMSI-A"). (D.I. 18) The second motion was filed by Defendant/Counterclaim Plaintiff/Third-Party Plaintiff RSUI Indemnity Company ("RSUI"). (*See* D.I. 22) Both motions seek declaratory judgments relating to whether coverage exists under certain director and officer liability insurance policies issued by RSUI to Third-Party Defendant EMSI Holding Company ("EMSI"). In general, EMSI-A argues that coverage applies, while RSUI takes the opposite view. (*See* D.I. 19, 23) The motions have been fully briefed (*see* D.I. 27, 28) and were argued before the Court on September 5, 2017 (*see* D.I. 38 ("Tr.")).

## I. BACKGROUND

### A. EMSI-A Acquires EMSI

On November 3, 2015, EMSI-A, a Delaware limited liability company, entered into a Stock Purchase Agreement (the "SPA") pursuant to which EMSI-A became the 100% shareholder of EMSI. (*See* D.I. 23 at 3) After the sale closed, EMSI-A sent demand letters to former EMSI Directors Mark S. Davis and Robert P. Brook (the "Management Sellers") seeking indemnification for financial misconduct allegedly committed by the Management Sellers prior to the sale of EMSI to EMSI-A. (*See* J.A. 141-43) The Management Sellers provided RSUI with prompt notice of EMSI-A's demand letters and, in turn, demanded that RSUI provide the Management Sellers with a defense or indemnification under their director and officer liability insurance policies with RSUI. (*See* J.A. 140) At the same time, the Management Sellers

1

demanded indemnification from EMSI pursuant to the company's bylaws. (*See* D.I. 23 at 3; D.I. 11 ¶ 29)

### B. Litigation Ensues Between EMSI-A and Management Sellers

On August 10, 2016, EMSI-A filed suit against the Management Sellers (and others) in the Delaware Court of Chancery. *See EMSI Acquisition, Inc. v. Contrarian Funds, LLC*, C.A. No. 12648-VCS (J.A. 144-210) (the "Underlying Action"). The Underlying Action alleges breaches of the representations and warranties in the SPA that occurred while the SPA was being negotiated between May and October 2015. (*See* J.A. 147) The Management Sellers notified RSUI of the complaint and once again demanded a defense and indemnity. (*See* D.I. 3 ¶ 21) RSUI responded by denying any duty to defend or indemnify the Management Sellers in the Underlying Action. (*See* J.A. 211-20) (the "Coverage Letter")

### C. Litigation Ensues Between Management Sellers, RSUI, and EMSI

On October 27, 2016, the Management Sellers filed suit against RSUI in the Delaware Court of Chancery, seeking a declaration of coverage and defense under the RSUI Polices (as defined later in this Opinion). *See Davis v. RSUI Indem. Co.*, C.A. No. 12857-VCS (D.I. 1 Ex. 1) (the "Instant Action"). That same day, the Management Sellers also filed suit in the same court against EMSI, seeking a declaration of their mandatory advancement rights and recovery of the costs and fees incurred in enforcing those rights. *See Davis v. EMSI Holding Co.*, C.A. No. 12854-VCS (J.A. 221-31) (the "Indemnity Action"). On November 1, 2016, EMSI sought coverage from RSUI for the Indemnity Action. (*See* D.I. 6 ¶ 37)

In response, RSUI filed a notice of removal, removing the Management Seller's Instant Action against RSUI to this Court. (*See* D.I. 1) On November 22, 2016, RSUI answered the

Management Sellers' complaint in the Instant Action, asserted a counterclaim seeking a declaration that coverage was excluded, and filed a third-party complaint against EMSI, which seeks a similar declaration of coverage exclusion in relation to the Management Seller's Indemnity Action against EMSI. (*See* D.I. 3, 6) In December 2016, in the Instant Action, the Management Sellers filed an answer to RSUI's counterclaim, and EMSI filed an answer to RSUI's third-party complaint. (*See* D.I. 11, 12)

### D. The Parties File the Pending Motions

On March 22, 2017, in the Instant Action, the Management Sellers and RSUI filed cross-motions for judgment on the pleadings, seeking declaratory judgment as to whether coverage exists (as the Management Sellers contend) or not (as RSUI contends) under either of the two RSUI Policies. (*See* D.I. 18, 22) Subsequently, the Management Sellers and EMSI-A entered into a settlement agreement, pursuant to which EMSI-A was assigned all right, title, and interest in the Management Sellers' claims in the Instant Action. (*See* D.I. 33 Ex. A) On August 24, 2017, this Court granted the Management Sellers' unopposed motion to substitute EMSI-A as Plaintiff and Counterclaim Defendant here. (*See* D.I. 35) Thus, the pending motions relate to disputes between EMSI-A and RSUI.

All parties agree that an actual case or controversy exists among them concerning whether coverage exists under the RSUI Policies and that the relevant facts were admitted in the pleadings. (*See* D.I. 19 at 8; D.I. 23 at 6) The Court agrees as well. EMSI further acknowledges that it is a Delaware corporation. (*See* D.I. 12 ¶ 6)

### E. The RSUI Insurance Policies

The Instant Action, as well as the pending motions, arises from two director and officer liability insurance policies RSUI issued to EMSI (together, the "RSUI Policies" or the "Policies"). (*See* J.A. 001-139)

The first policy, Policy No. NHP661503, had an initial policy period running from February 21, 2015 to February 21, 2016 (the "Pre-Acquisition Policy"). (*See* J.A. 005-67) EMSI's application for that policy, which lists all EMSI shareholders and members of the EMSI Board of Directors as of the date of the application (the "Application") (*see* J.A. 060-67), was incorporated into the Pre-Acquisition Policy at multiple points (*see* J.A. 005, 023, 056, 062).

In anticipation of EMSI-A's purchase of EMSI, EMSI exercised an option in the Pre-Acquisition Policy to purchase a Discovery Period Election ("DPE") endorsement for $119,662. (*See* J.A. 001) The DPE endorsement had the dual effect of terminating coverage under the Pre-Acquisition Policy for alleged Wrongful Acts occurring after November 3, 2015, and extending the discovery period during which EMSI could report "Claims . . . against any Insured . . . for any Wrongful Act that occurred *prior* to November 3, 2015" that were "otherwise covered" by the Pre-Acquisition Policy. (*See id.*) (emphasis added) As the DPE endorsement makes clear, "All other terms and conditions of [the Pre-Acquisition Policy] remain unchanged." (*Id.*)

RSUI then issued EMSI a second insurance policy, Policy No. NHP665276, to cover claims for Wrongful Acts occurring *after* November 3, 2015 (the "Post-Acquisition Policy"). (*See* J.A. 068-139) (emphasis added)

Both of the RSUI Policies contain largely the same coverage provisions and endorsements. Section 5(A) provides that RSUI has "the right and duty . . . to defend any Claim

4

against the Insured [EMSI] for which coverage applies." (J.A. 053, 122) A "Claim" is defined, in part, as a "written demand for monetary or non-monetary relief" or a "civil . . . proceeding for monetary or non-monetary relief." (J.A. 009, 072) A "Wrongful Act" is defined as "any actual or alleged act, error, . . . neglect or breach of duty . . . by [a]n Insured Person acting in his or her capacity . . . on behalf of the Insured Organization." (J.A. 051, 120) The Policies define an Insured Person as "[a]ny past, present or future director [or] officer . . . of the Insured Organization." (J.A. 050, 119) The Insured Organization is EMSI. (*See* J.A. 005, 068) The Policies also state, in all caps and on separate pages, that each is a "claims made" policy (as opposed to an "occurrence policy"). (*See* J.A. 046, 115)[1]

Section V(I)(3) of the Pre-Acquisition Policy (the "M&A Clause") provides that in the event of a 50% or more change in ownership of EMSI, coverage under the Pre-Acquisition Policy will continue "for any Wrongful Act occurring prior to" the change in ownership, but not for any Wrongful Acts that occur after the acquisition transaction. (*See* J.A. 055-56) By purchasing the DPE endorsement, EMSI extended the policy reporting period – under the Pre-Acquisition Policy – for claims based on Wrongful Acts occurring prior to November 3, 2015 into the year 2021. (*See* J.A. 001)

The RSUI Polices also contain certain exclusions. Most pertinent here is the "Major Shareholder Exclusion" (the "MSE") of the Pre-Acquisition Policy, which excludes from coverage "payment for Loss arising out of . . . any Claim brought by . . . [an] entit[y] that own[s]

---

[1] Under a claims made policy, coverage determinations are based on the date on which the claim is made. *See Hoechst Celanese Corp. v. Certain Underwriters at Lloyd's, London*, 656 A.2d 1094, 1095 (Del. 1995). Alternatively, under an occurrence policy, coverage determinations are based upon the date on which the alleged wrongful act occurred. *See id.* at n.1.

5

. . . five percent (5%) or more of the outstanding stock of the Insured Organization." (J.A. 018, 082) The Post-Acquisition Policy includes an additional "Prior Acts Exclusion," which excludes "any Claim made against any Insured . . . based upon . . . Wrongful Acts which first occurred prior to November 3, 2015." (J.A. 084)

## II. LEGAL STANDARDS

### A. Motion for Judgment on the Pleadings

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." When evaluating a motion for judgment on the pleadings, the Court must accept all factual allegations in a complaint as true and view the pleadings in the light most favorable to the non-moving party. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008).

A Rule 12(c) motion will not be granted "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Id.* (citation omitted). "The purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 617 (D. Del. 2008); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining that documents integral to pleadings may be considered in connection with Rule 12(c) motion). A court may grant a motion for judgment on the pleadings (like a motion to dismiss) only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to [the non-moving party],

6

[the non-moving party] is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000) (citation omitted).

The Court may consider matters of public record as well as authentic documents upon which the complaint is based, if attached to the complaint or as an exhibit to the motion. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). Ultimately, a motion for judgment on the pleadings can be granted "only if no relief could be granted under any set of facts that could be proved." *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

### B. Interpretation of Insurance Contracts

The RSUI Policies state that they are to be interpreted in accordance with the laws of the Insured Organization's state of incorporation. (*See* J.A. 057, 126) EMSI, the Insured Organization, is incorporated in Delaware. (*See* D.I. 12 ¶ 6) Accordingly, the RSUI Policies will be construed pursuant to Delaware law. *See Trs. of Bos. Univ. v. Ligand Pharm., Inc.*, 2003 WL 1873839, at *3 (D. Del. Apr. 11, 2003).

Under Delaware law, interpretation of an insurance contract "is purely a question of law." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). Insurance contracts, like all contracts, are interpreted as a whole and construed to give effect to the parties' intentions. *See AT & T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1108 (Del. 2007). When contract language is clear and unambiguous, it must be given its plain and ordinary meaning. *See Rhone-Poulenc*, 616 A.2d at 1195-96. A contract is unambiguous when "the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'" *Id.* at 1196

7

(quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983)). Additionally, a term is not ambiguous merely because the parties disagree on its meaning. *See AT & T Corp.*, 918 A.2d at 1108. Rather, an ambiguity exists only if the term is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196.

If an ambiguity does exist, "the doctrine of *contra proferentum* requires that the language of an insurance contract be construed most strongly against the insurance company that drafted it." *Id.*; *see also Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1151 (Del. 1997) (holding that if provision is ambiguous, "the issue of coverage must be resolved in favor of the insured"). Further, if an ambiguity exists, the doctrine of reasonable expectations applies, under which "the policy will be read in accordance with the reasonable expectations of the insured." *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 927 (Del. 1982).

Under Delaware law, the insured bears the initial burden of demonstrating that the claimed loss falls within the policy's grant of coverage. *See Deakyne v. Selective Ins. Co. of Am.*, 728 A.2d 569, 571 (Del. Super. Ct. 1997). Once the insured has met this burden, the insurer bears the burden of proving that a policy exclusion applies. *See id.* To prove an exclusion applies, the insurer must demonstrate that "every allegation of the underlying complaint . . . fall[s] 'solely and entirely' within specific and unambiguous exclusions from coverage." *Capano Mgmt. Co. v. Transcon. Ins. Co.*, 78 F. Supp. 2d 320, 324 (D. Del. 1999) (citation omitted). Again, any ambiguity in an insurance contract is construed against the insurance company that drafted it. *See Rhone-Poulenc*, 616 A.2d at 1196.

## III. DISCUSSION

The Management Sellers and EMSI tendered demands for coverage under both the Pre-Acquisition and Post-Acquisition Policies. (*See* D.I. 23 at 16) The Coverage Letter indicates that RSUI recognized these demands as constituting proper notices of claims for alleged Wrongful Acts against an Insured Person during the discovery period, and RSUI appears to concede coverage was "triggered" by the demands. (*See* J.A. 216; D.I. 26 at 4) Thus, EMSI-A has satisfied its initial burden to show that its claim is within the scope of the Policies' coverage. The burden now shifts to RSUI to show that the Policies unambiguously exclude such coverage. Accordingly, there are two issues before the Court: (1) whether coverage under the Pre-Acquisition Policy and Post-Acquisition Policy is barred by the Major Shareholder Exclusion, and (B) whether coverage under the Post-Acquisition Policy is barred by the Prior Acts Exclusion.[2]

### A. The Major Shareholder Exclusion

The essential task before the Court is to determine the relevant time for identifying shareholders for purposes of applying the MSE. EMSI-A contends that the MSE only applies to shareholders who owned 5% or more of EMSI's shares at the time the Pre-Acquisition Policy was issued or at the time the Wrongful Act occurred. (*See* D.I. 19 at 12) That is, EMSI-A contends that the MSE "can only [apply to] owners at the time the [Pre-Acquisition] Policy issued and/or the alleged Wrongful Act occurs," and, therefore, does not bar coverage here

---

[2]While RSUI contends that the MSE precludes coverage under both Policies, it contends that the Prior Acts Exclusion only precludes coverage under the Post-Acquisition Policy. (*See* D.I. 23 at 15-17)

9

because EMSI-A was not a shareholder of EMSI at the time of the alleged misconduct by the Management Sellers. (*See id.*)

RSUI counters that the MSE applies to shareholders who own 5% or more of EMSI's shares at the time a claim is made under the Policies. (*See* D.I. 23 at 8) In RSUI's view, Major Shareholder status must be determined when the claim is made. (*See id.*) Therefore, the MSE bars coverage for the claims brought by EMSI-A, as EMSI-A is the current 100% shareholder of EMSI. (*See id.*) Furthermore, as "'every allegation' in the Underlying Action" is brought by EMSI-A, it follows, according to RSUI, that RSUI has satisfied its burden of showing that every allegation falls entirely within the MSE. (*See* D.I. 26 at 5-6)

The MSE states:

> The Insurer shall not be liable to make any payment for Loss arising out of or in connection with any Claim brought by or on behalf of individuals or entities that own, beneficially or directly, five percent (5%) or more of the outstanding stock of the Insured Organization.

(J.A. 018)

EMSI-A contends that the MSE's use of the present tense verb "own" proves its interpretation of the MSE is correct. (*See* D.I. 19 at 12) Alternatively, EMSI-A argues that the MSE's silence as to the appropriate time to determine who "presently" owns EMSI stock renders the provision ambiguous. (*See id.* at 12; Tr. at 8-9) This ambiguity, EMSI-A contends, is reinforced by contrasting the language of the MSE with the policy's "Insured Person" provision, which expressly extends coverage to "[a]ny past, present, or future director [or] officer." (*See* Tr. at 7-8; *see also* J.A. 050) EMSI-A also stresses that RSUI incorporated the Application into the Pre-Acquisition Policy and did not require EMSI to update the list of shareholders upon election

10

of the DPE endorsement. (*See* D.I. 24 at 4-7; Tr. at 13-14) According to EMSI-A, this would lead a reasonable reader to interpret the MSE as applying to those shareholders originally listed in the Application; that is, again, it supports the conclusion that the appropriate times to identify the shareholders to whom the MSE applies is when the Pre-Acquisition Policy issued or when the Wrongful Acts occurred. (*See id.*)

As further support for its view, EMSI-A points to the DPE endorsement and the M&A Clause. The DPE endorsement requires that coverage in the post-acquisition period be determined based upon the date of the Wrongful Act, i.e., whether the Wrongful Act occurred before the acquisition closed on November 5, 2015. (*See* J.A. 001) But if application of the MSE required, as RSUI contends, "look[ing] at the status of the shareholder at the time of the claim," this would lead to an "incongruous" result: the policy – and therefore the Court – would look to one time (when the Wrongful Act occurred) to determine if coverage exists, but another (when the claim is made) to determine if coverage is barred. (*See* Tr. at 12) Somewhat relatedly, EMSI-A contends that EMSI's purchase of the DPE endorsement converted the undisputedly "claims made" Pre-Acquisition Policy into the functional equivalent of an "occurrence policy." (D.I. 24 at 2-4) But RSUI's interpretation of the MSE, by excluding coverage based on shareholder status at the time the claim is made, ignores the operative time for determining coverage in the post-acquisition context. (*See* Tr. at 12) ("[T]he policy in a post-acquisition context determines coverage based upon the date of the wrongful act.")

Further, RSUI's interpretation, in EMSI-A's view, would render the DPE endorsement "virtually meaningless" by denying the Management Sellers coverage for claims made by buyers of EMSI in connection with an acquisition, the very claims EMSI-A contends are the most likely

11

to be brought after a sale occurs. (*See* D.I. 19 at 14-15, 18) This would leave the Management Sellers without coverage under either the DPE endorsement or the Post-Acquisition Policy for the claims they would have been most likely to anticipate. (*See id.*) In the view of EMSI-A, this cannot have been what the parties intended, particularly given that the M&A Clause provides that coverage under the Pre-Acquisition Policy will continue subsequent to a transaction that changes the majority shareholder of EMSI, "for any Wrongful Act occurring prior to" the change in ownership. (*See* J.A. 055-56) RSUI's interpretation of the MSE would, according to EMSI-A, run counter to the intent of this provision. (*See* Tr. at 12) ("[T]his M&A clause . . . clearly spells out how this policy is going to work after an acquisition, yet it doesn't say anything about the new acquirer being considered a major shareholder for purposes of the major shareholder exclusion.")

RSUI, of course, sees the situation quite differently. For its part, RSUI contends that the language of the MSE clearly and unequivocally bars coverage here. (*See* D.I. 23 at 8) RSUI argues that the MSE's use of the present-tense "own" can only mean that Major Shareholder status must be determined based on whether the claimant presently (i.e., at the time the claim is made) owns EMSI stock, rather than based on who "owned" stock in the past. (*See id.* at 9) The MSE did not need to say anything further to convey this meaning because, RSUI contends, the Pre-Acquisition Policy is a claims made policy and, hence, coverage is determined when the claim is made. (*See* D.I. 26 at 8-9)

RSUI also takes issue with EMSI-A's reading of the DPE Endorsement and M&A Clause. RSUI argues that even though the DPE endorsement extended the discovery period for claims based on Wrongful Acts that occurred prior to November 3, 2015, it does not follow that

12

all coverage decisions should be tied to the time of the Wrongful Act. (*See id.* at 14-16) Rather, RSUI emphasizes that the DPE endorsement clearly states that coverage extends only as "otherwise covered" by the Pre-Acquisition Policy and that "[a]ll other terms and conditions of [the Pre-Acquisition Policy] remain unchanged." (*Id.* at 15-16; *see also* J.A. 001) Thus, for RSUI, it is "irrelevant" when the facts giving rise to the claim occurred because "the policy never covered claims made by a major shareholder" and that fact did not change after the acquisition (i.e., the scope of coverage was not expanded). (*See* Tr. at 24-25, 32-33) RSUI also rejects EMSI-A's contention that the Pre-Acquisition Policy became an occurrence policy, or its functional equivalent, upon election of the DPE endorsement. (*See* D.I. 27 at 6-8)[3] Moreover, RSUI argues that its interpretation of the MSE does not render coverage illusory or meaningless and provides a number of examples of coverage entirely unaffected by the MSE. (*See* D.I. 26 at 18)

Finally, RSUI attacks EMSI-A's attempt to "link" the Application to the MSE. In RSUI's view, EMSI-A's approach would improperly treat shareholder status as effectively static, which it is not, even for a closely-held private company such as EMSI. (*See id.* at 11-14; Tr. at 35-37) RSUI adds that EMSI misstated its shareholders on the Application and, if the MSE were interpreted as applying only to those shareholders named in the Application, it would leave the MSE with "no teeth whatsoever." (Tr. at 35-37)

Having considered these competing arguments, the Court concludes that the MSE is ambiguous. Both sides have proposed interpretations that are at least reasonable. EMSI-A's

---

[3]RSUI points out that the cases EMSI-A relies upon for this proposition come from four non-binding courts tasked with interpreting claims under state Guaranty Acts. (*See* D.I. 27 at 6-7)

13

view that the MSE is applicable only to those who were major shareholders at the time of the issuance of the Pre-Acquisition Policy or those who were major shareholders at the time of a Wrongful Act is not unreasonable, particularly in light of EMSI's election of the DPE endorsement. No provision of the Pre-Acquisition Policy explicitly provides that applicability of the MSE will evolve as the ownership of EMSI evolves. This silence – especially in conjunction with other provisions of the Policy, such as the definition of Insured Person, which explicitly extend to "[a]ny past, present or *future* director [or] officer . . . of the Insured Organization" (J.A. 050) (emphasis added) – helps render EMSI-A's interpretation a plausible one.[4] Moreover, EMSI's interpretation is consistent with what would seem, to a reasonable person, to be the purpose of the MSE (to prevent those who controlled the company at the time of the policy's issuance to engage in Wrongful Acts in the knowledge they would be insured, as those earlier controlling shareholders remain excluded regardless of the subsequent change of ownership) while also giving full effect to the M&A Clause and the Management Sellers' expectation that an acquisition of EMSI by a third-party would be an occasion raising some real possibility of a claim being brought against them. Further, that the Pre-Acquisition Policy incorporates the Application,[5] which lists the major shareholders as of the issuance of that Policy but which the

---

[4] RSUI's emphasis on *OZ Minerals Holdings Pty Ltd v. AIG Australia Ltd*, [2015] VSC 185, 2015 WL 2066031 (Supreme Court of Victoria, Australia May 6, 2015), is unpersuasive. In *OZ Minerals*, the policy exclusion specified that it excluded claims "brought by any *past or present* shareholder." *See id.* ¶ 6 (emphasis added). That language is materially different from the language before the Court, which provides no guidance as to whether "own" – at least in the post-acquisition context – refers to those who "own" the relevant threshold of stock at the time the Policies issued, the time the Wrongful Acts occurred, or the time the claim is made.

[5] Again, RSUI expressly incorporated EMSI's Application into the Pre-Acquisition Policy. (*See* J.A. 005, 023, 056, 062) Given the importance of insurance applications to discerning the parties' intent, this is not insignificant. *See* 2 Steven Plitt, *Couch on Insurance* § 18.1 (3d ed.

14

DPE endorsement did not require to be updated, along with the fact that EMSI was a closely-held private company for which the identity of the shareholders was perhaps unlikely to change, also help render EMSI's interpretation of the MSE a reasonable one.

On the other hand, RSUI has also stated a plausible interpretation of the MSE. It is plainly reasonable to construe a provision that expressly applies to "individuals or entities that *own*, beneficially or directly, five percent (5%) or more of the outstanding stock" (J.A. 018) (emphasis added) as applying to individuals or entities that, at the time a claim is made, "own" this amount of shares. While the parties may have intended to limit application of this provision to those who own this amount of shares at the time the Policy is issued, as EMSI-A contends, nothing in the Pre-Acquisition Policy clearly and unambiguously dictates such an outcome. Further supporting the reasonableness of RSUI's interpretation is that the Pre-Acquisition Policy is a claims made policy (putting the focus on the circumstances at the time a claim is made), a characteristic one might reasonably conclude never changed, particularly as the DPE endorsement states that "[a]ll other terms and conditions of [the Pre-Acquisition Policy] remain unchanged." (J.A. 001) Also, as RSUI argues, if the MSE is limited in application only to the specific individuals and entities identified in the Application, that "is a very convoluted manner" of establishing such a limitation. (Tr. at 53-54)

In the post-acquisition context, whether coverage exists under the Pre-Acquisition Policy depends on the timing of two things: when the claim is made and when the alleged Wrongful Acts occurred. (*See* J.A. 001) Under the DPE endorsement, the parties must first look to the

---

2017) ("Where properly incorporated in the policy, however, the application forms an integral part of the contract.").

15

time the claim is made to determine if it is within the six year discovery period. (*See id.*) If so, the parties must then look to the time of the alleged Wrongful Act, to determine if it occurred prior to November 3, 2015 and is, therefore, eligible for coverage. (*See id.*) Thus, all coverage determinations under the Pre-Acquisition Policy, as modified by the DPE endorsement, turn on both the timing of the claim and the timing of the alleged Wrongful Act.

Despite this, RSUI contends that it is unambiguous that a determination of Major Shareholder status must be pegged solely to the time the claim is made. (*See* D.I. 26 at 15-16) The Court disagrees. While RSUI emphasizes that the Pre-Acquisition Policy never afforded coverage for claims by a Major Shareholder, that proposition does not resolve the ambiguity of the MSE. The ambiguity in the MSE is not a matter of whether the RSUI Policies bar claims by Major Shareholders, but, instead, is a function of who those Major Shareholders are: those who own stock at the time the claim is made, or those who own stock at the time of the alleged Wrongful Acts. *See generally Phila. Indem. Ins. Co. v. Hallmark Claims Serv. Inc.*, 2008 WL 5191910, at *8 (N.D. Tex. Dec. 10, 2008) (finding "related entities" exclusion in claims made policy with present tense verb to be ambiguous "as to whether the exclusion applies at the time the claim was made or at the time any underlying wrongful act might have occurred"). As EMSI-A points out, it would be at least somewhat incongruous to determine coverage based on the date of the Wrongful Act, while determining application of the MSE based on the date of the claim.

This conclusion is reinforced by the possibility that the Pre-Acquisition Policy was converted to an occurrence policy upon election of the DPE endorsement. *See McCuen v. Am. Cas. Co.*, 946 F.2d 1401, 1406 (8th Cir. 1991) (finding coverage under claims made D&O liability policy based on time of alleged wrongful acts); *Byrne v. Joliet Med. Grp., Ltd.*, 1992 WL

16

159178, at *3 (N.D. Ill. June 29, 1992) ("In general, tail coverage, or a reporting endorsement, converts the claims made coverage into occurrence based coverage for the policy period."); *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1357 (Colo. 1993) (explaining general principles of insurance coverage, including that purchase of extended reporting period for "future claims made for incidents occurring during the time of the claims-made coverage . . . . turns claims-made coverage into occurrence coverage"); *Universal Health Servs., Inc. v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 884 A.2d 889, 896-97 (Pa. Super. Ct. 2005) (collecting cases to conclude "substantial support" exists for "notion that a claims-made policy with a reporting tail is the functional equivalent of an occurrence policy"). While many of these cases arose in a different context, they all speak in general terms about how insurance contracts operate and, thus, provide some support for EMSI-A's position. *See also generally* 7 Steven Plitt, *Couch on Insurance* § 102:28 (3d ed. 2017) (stating tail coverage generally "turns claims-made coverage into occurrence coverage").[6]

In the end, then, the MSE is ambiguous, as it is amenable to at least two reasonable interpretations. *See Rhone-Poulenc*, 616 A.2d at 1196 (holding term is ambiguous if "reasonably

---

[6]RSUI's reliance on *Township of Center v. Mercury Syndicate, Inc.*, 117 F.3d 115 (3d Cir. 1997), is misplaced. In that case, which presented an "insured versus insured" provision in a claims made policy, and held that whether coverage was barred should be determined at the time the claim was made, the policy involved did not include a discovery period or tail coverage. *See id.* at 118. Thus, the court was not presented with the question of how to interpret an insurance provision in a context analogous to the one here. Nor is *Four Seasons Healthcare, Inc. v. Willis Insurance Services of Georgia, Inc.*, 682 S.E.2d 316 (Ga Ct. App. 2009), helpful to RSUI. While the shareholder exclusion at issue there was very similar to the one involved here, *see id.* at 318, it is not clear that the claimants remained shareholders at the time the claim was made, *see id.* at 317; *see also APA Excelsior III, L.P. v. Windley*, 329 F. Supp. 2d 1328, 1361 (N.D. Ga. 2004) (detailing shareholder-plaintiffs' contentions in underlying suit at issue in *Four Seasons*, including that "they ended up with no ownership in the Companies, while 'the controlling other shareholder ended up with 100%'").

or fairly susceptible of different interpretations"). As such – and as is undisputed in this case (*see* Tr. at 26-27) – the ambiguity must be construed against RSUI, as the insurer and drafter of the Policies, and in favor of the insured, EMSI-A. *See Rhone-Poulenc*, 616 A.2d at 1196; *see also Oglesby*, 695 A.2d at 1151. Thus, the Court concludes that the MSE does not bar coverage in the Underlying Action.

### B. The Prior Acts Exclusion

RSUI contends that it is independently entitled to judgment on the pleadings on Count II of its counterclaim and third-party complaint based on the Prior Acts Exclusion of the Post-Acquisition Policy. (*See* D.I. 23 at 15-17) The Prior Acts Exclusion provides:

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged Wrongful Acts which first occurred prior to November 3, 2015.

(J.A. 84) RSUI argues that the language in the Prior Acts Exclusion is clear and unambiguous and bars coverage because the Underlying Action alleges Wrongful Acts by the Management Sellers occurring between May and October 2015 – that is, prior to November 3, 2015. (*See* D.I. 23 at 15-17)

The Court agrees. The language of the Prior Acts Exclusion unambiguously precludes coverage for claims based on alleged wrongdoing occurring prior to November 3, 2015. Given that all the alleged Wrongful Acts in the Underlying Action occurred prior to November 3, 2015, the Prior Acts Exclusion operates as a bar to coverage under the Post-Acquisition Policy. *See Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1062 (Del. 2010) (holding prior acts exclusion in insurance contract barred coverage).

## IV. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part EMSI-A's motion for judgment on the pleadings and grant in part and deny in part RSUI's motion for judgment on the pleadings. An Order consistent with this Memorandum Opinion will be entered.